UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| REUTERS NEWS & MEDIA, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 22-0587 (TSC-ZMF) |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| Defendant. | |

## DEFENDANT'S OPPOSITION TO MOTION FOR PRODUCTION ORDER

Defendant Department of Health & Human Services (the "Department"), by and through

undersigned counsel, respectfully opposes Plaintiff Reuters News and Media, Inc. ("Reuters")'s

motion for production order, ECF No. 53. A proposed order is attached.

## BACKGROUND

I.    **Reuters' Unreasonably Burdensome FOIA Request**

On August 9, 2021, Reuters submitted a request under the Freedom of Information Act

("FOIA") for the following information

1)    Analysis, documents or reports related to the performance of contractors or
subcontractors awarded contracts by HHS, including APSR and BARDA related to
all healthcare, medicines, vaccines, therapies, syringes, respirators and other
medical needs for the response to the COVID-19 pandemic from January 1, 2020
to present, including the attached contracts.

2)    FDA communications related to the contractor's performance before award or after
award. (Date Range for Record Search: From 1/1/2020 To 8/5/2021)"

FOIA Request at 1, ECF No. 1-1.

The Department conducted a search for responsive records using a search protocol that the parties agreed ahead of time would constitute an adequate search. *See* Ex. A, Williams Decl. ¶ 43.[1] This search yielded approximately 778.75 gigabytes of potentially responsive records. *Id.* This set of material was so large that the Department was unable to upload it into its FOIA processing software system. *Id.* The Department uploaded a ten-gigabyte subset of this material from a single custodian to perform a preliminary analysis, which showed that these materials amount to 38,194 pages prior to deduplication. *Id.* Deduplication reduced this page count to 20,181. *Id.* Assuming that this ten-gigabyte subset is a representative sample and extrapolating from it, the Department estimates that the full set of potentially responsive material amounts to approximately 1,571,373 pages. *Id.* The size of this request is "unprecedented" for the Department's FOIA office. *Id.* ¶ 46.

The Department also estimates that reviewing each page would take between six and fifteen minutes—five to ten minutes for the FOIA office to review, then another one to five minutes for the Office of the General Counsel to review. *See* Williams Decl. ¶ 44. Using the most conservative estimate of six minutes per page, the Department estimates that reviewing the full set of potentially responsive materials would take about 17.92577 years, assuming a single Department employee continuously processed pages without ever taking breaks to eat, sleep, or do anything else. *Id.*

If one instead assumes that processing each page will takes ten and a half minutes—i.e., the midpoint between six and fifteen minutes—rather than using the conservative low-end estimate of six minutes, processing the full set of potentially responsive records would take about 31.37 years. *See* Williams Decl. ¶ 44. Assuming a Court-ordered processing rate of 500 pages per month,

---

[1]     Reuters is correct that the Department initially said that it had conducted the agreed-upon search, which it later discovered was incorrect. What Reuters omits is that upon discovering this fact, the Department promptly notified Reuters and withdrew its then-pending summary judgment briefing on the search's adequacy. *See* ECF Nos. 19, 20, 34; Min. Order (May 13, 2024). Thus, this incident shows that the Department acted in good faith upon discovering a mistake.

which is typical in this District, processing the request would take more than 261.895 years. *Id.* Even assuming that the Department processes pages at a rate of 5,000 per month, as Reuters urges the Court to order, *see generally* Pl.'s Mot., processing Reuters' request would take more than 314 years. And notably, none of these estimates account for the potential need to refer pages to other agencies for consultation, which could only add time to this process. *See* Williams Decl. ¶ 45.

"Given the enormous volume of the returned records and the considerable amount of time it would take for the [ ] FOIA Office to review and appropriately redact to process these pages," the Department believes that processing the full request "would create an extraordinary and undue burden." Williams Decl. ¶ 47. "By its nature, FOIA processing requires human beings to manually analyze records to determine whether information is, based on content and context, not only responsive to the FOIA request, but also exempt or non-exempt from disclosure." *Id.* "Further, [the Department] is unconvinced that processing the records will result in many pages that will be responsive to [Reuters'] FOIA request." *Id.* ¶ 48. "The request terms are too general and broad. It is set up into 3 qualifiers, with the first being companies, the second being anything that brings in the word 'COVID' among other terms, and the third having terms like 'problem, concern, contract, FDA, difficult, etc.'" *Id.* "The terms in the second and third qualifiers are so broad and used so commonly, any document that contains the word covid (which is a lot of documents) is probably going to contain a word from the third set of terms as well. Therefore, it is [the Department's] belief that many of the returned documents will not be responsive to [Reuters'] request." *Id.*

At the end of Fiscal Year 2024, the Department's FOIA office had received 2,819 requests, nearly twice as many as the previous year. Williams Decl. ¶ 28. The trend over time has been an increase in FOIA requests since at least Fiscal Year 2017. *Id.* As of November 2024, the FOIA office had 24 personnel responsible for managing FOIA requests, appeals, and litigation. *Id.* ¶ 32.

That figure was lower than in prior years for budgetary reasons, *id.*, and is dramatically lower now, ten months later, after recent efforts to reorganize and streamline federal government operations. Further, the complexity of incoming FOIA requests and volume of potentially responsive material has increased year over year as well. *Id.* ¶ 33. This simultaneous increase in the number and complexity of incoming FOIA requests and the number of records potentially responsive to such requests has resulted in increased demands on personnel available to process these requests, such that each employee is handling a higher volume of FOIA requests than ever before. The attached declaration, produced to Reuters in November, *see id.*; Notice, ECF No. 44, provides greater detail about the FOIA office's workload as of November 2024, which has only grown since then.

## II.   The September 18, 2024, Status Conference

The parties eventually reached an impasse over whether Reuters' request is unreasonably burdensome and requires narrowing. *See* Jt. Status Rpt. (Aug. 22, 2024), ECF No. 37. The Court set a status conference to discuss the matter and facilitate a resolution. *See* Not. (Sept. 9, 2024).

At the status conference, Reuters' counsel represented, "we are willing to narrow," but that "we need some actual numbers" so that it would not need to "narrow from a black box." Hr'g Tr. at 15:6, 18, 23-25, ECF No. 42. This Court said, "I think all of today is a goal of, what does one side have to do to get the other side to narrow it? And it cuts both ways." *Id.* at 19:2-4. The Court directed the Department to provide Reuters additional information regarding the set of potentially responsive records as a "gesture" of good faith, and expressed that in turn, it was "hopeful that [Reuters] is going to keep [its] heart open for love in this situation." *Id.* at 21:1, 8-9.

The Court admonished, "We gotta have finality," and stated that the "ultimate question" is "what is the narrowing of scope from the parties' negotiations." Hr'g Tr. at 24:14-16. The Court told the Department that "the more that you" answer Reuters' questions, "the more I think it puts

your—helps the moral persuasion of your argument" and "the more of this you do, the more helpful

it is to your argument. . . . the more information [Reuters] gets, the less likely [it] is to litigate,

because [its] going to think, oh, well, the judge is going to think already that they've done enough."

*Id.* at 25:23-25, 26:4-9. The Court recognized that "you're right, at some point" answering Reuters'

queries about the set of responsive records "is its own burden, which then just begs the question

of, isn't this all too burdensome? And so it doesn't sound like we're there yet. But if we get there,

you know, you're welcome to come back before me and we can talk more." *Id.* at 26:21-25, 27:1.

The Court told the Department that it was "pretty sympathetic to plaintiff here" because it

understood the "spirit" of Reuters' position to be that it is "just trying to narrow the scope. . . . let's

not disincentivize narrowing. . . . now the request might still be too burdensome; I'm not opining

on that at all." Hr'g Tr. at 28:5-8, 29:12, 14-15. "Let's hope they continue to narrow it," the Court

said, "because I think, you know, you've laid out facts that certainly give me a lot of heartburn. I

don't want [the Department], for the next 300 years or whatever, to be working on one request. . . .

frankly, it's better for your burden argument the broader [the request] is." *Id.* at 29:22-25, 30:5-6.

Reuters' counsel then represented that Reuters already had, in fact, narrowed the scope of

its request: "we've narrowed it to custodians at this point . . . . So we're no longer asking for

everyone's emails." Hr'g Tr. at 32:21, 23-24. The Court stated that while Reuters' request used

broad "relating to" language, the language's breadth "is only a problem when you get 1.5 million

[records], not when you get three documents." *Id.* at 34:11-12. The Court recognized, however,

that Reuters' request required "narrowing" from its current form, and expressed its hope that the

parties would be able to work together "offline" to narrow the request's scope. *Id.* at 34:19, 22. "I

think that what I still hear from both sides," it said, is "there's still an appetite to talk to each other."

*Id.* at 41:7-8. The Court directed Reuters to "just come up with your narrowing." *Id.* at 42:8.

The Court directed the Department, meanwhile, "to facilitate as much as they reasonably can, because it will help in potential litigation, not only the, again, the moral persuasion argument but for me getting it right." Hr'g Tr. at 43:11-14. The Court then "reiterate[d]" that "[t]his cannot be an iterative process where it just . . . we don't know what's there behind the government's veil, and so now we use this to, like, hone and scope, and we didn't do our homework and we could have crafted a better request. That's not what I want. I don't think that's what's happening, but, you know, let's be judicious in how many requests we're making, [counsel], so that we're not—it doesn't feel like there's just no end in sight." *Id.* at 43:16-25. The Court expressed its belief that this was not going to happen because "whatever questions" Reuters is "asking is to get to [the] goal" of getting the information that it genuinely wants. *Id.* at 44: 17-18.

The Court then said that while it would not set an absolute limit on the number of questions that Reuters could ask the Department about the potentially responsive records. "I have a, you know, pain tolerance . . . . I don't want this to be, just because of the government, we keep asking over and over and above. And so this cannot be a boundless sort of inquiry process. It's got to be a point where there will be a boundary. And I'm sure my boundary is a little further than [the Department's], but I promise you it's less than [Reuters']. And so I'm going to try to split the baby. . . . I do think that there has to be an end to it. . . . I'm happy to remind [Reuters' counsel] that his client should understand that I think that we're reaching the end of the back-and-forth process and we're approaching the litigation and that I'm sympathetic to the fact that you all really have tried to get these answers." *Id.* 48:25, 49:1-11, 20-24. The Court expressed hope that this process, as "in other cases," would lead "to a narrowing or a resolution short of litigation." *Id.* at 50:2-3. In response to the Department's concern that Reuters would just keep asking more and more follow-up questions, the Court said that it would not impose a limit on the questions Reuters could ask at

that time, "[b]ut I totally agree with what you're saying and it's fair." *Id.* at 50:5-6. Addressing Reuters' counsel, the Court said, "I just want your client to hear . . . this cannot be a, you know, 12- or 15-round thing. This seems like a couple back and forth and that's that." *Id.* 50:15-18.

The Court directed the Department to provide Reuters a declaration explaining in detail the search that it had conducted and the burden that processing the full request would impose on it. *See* Hr'g Tr. at 20:18-19, 52:3-13. The Court also directed the parties to meet and confer, and told the Department that if complying with Reuters' requests for information proved "difficult," then "obviously talk to [Reuters' counsel] first and hopefully he'll be reasonable. . . . I appreciate that you both seem like you're trying to work on this." *Id.* at 56:22-23, 59:3-4.

## III.    The Parties' Communications Since the Hearing

After the hearing, the Department produced to Reuters a declaration containing information about the search that it conducted and the burden that the request imposed, as the Court directed. *See generally* Williams Decl.; Notice of Production, ECF No. 44. Reuters sent the Department a list of nine questions, mostly focusing on the Department's technological capacity for processing FOIA requests, which the Department answered—the questions and answers are set out below:

**1.    What is the exact error message that displays when HHS tries to upload the file to FOIAXpress?**

We do not get an error message in FX. It will just stall out and not be able to load.

**2.    When uploading to FOIAXpress, does HHS upload the file from the local disk or from the EDR File Server?**

We do it both ways, depending on the size of the file. Anything less than 10GB typically can be uploaded straight from the local disk, but larger files need to be uploaded to the EDR File Server. 10GB files can take a lot of time and be tricky when loading into the EDR server though.

**3.    Can HHS dedupe at the source?**

The documents are deduped when the files are loaded into ourEDR database.

**4.    What email system does HHS use?**

Outlook.

**5.    Does HHS do a search for all custodians at once and dedupe that or is each custodian searched separately?**

I believe that OCIO (our office that runs the searches) has to search each custodian separately.

**6.    What size is the mailbox limit?**

I am not sure exactly what this means.

**7.    Can HHS provide a search report or a log of the potentially responsive emails using its email system?**

I do not see a list of the emails until they are loaded into the system. I just receive the files from OCIO, which come in 10GB tranches.

**8.    Is HHS capable of seeing on the front-end (email system) if there are large attachments?**

No, I am unable to see attachments until they are loaded in the system.

**9.    What is the maximum attachment size allowed?**

I am not sure that there is a limit for a singular document. The reason that I believe we are getting so many documents is because the search terms are too general and broad. It is set up into 3 qualifiers, with the first being companies, the second being anything that brings in the word "COVID" among other terms, and the third having terms like "problem, concern, contract, FDA, difficult, etc." The terms in the second and third qualifiers are so broad and used so commonly, any document that contains the word covid (which is a lot of documents) is probably going to contain a word from the third set of terms as well. This means that the only real narrowing terms are the different companies, but companies like Pfizer and Moderna were discussed so much during this time period, that it really struggles to narrow the documents to what Plaintiff is looking for.

Ex. B, Email.

Reuters then sent the Department a list of four follow-up questions, which the Department once again answered. Set out below are Reuters' questions and the Department's answers:

**1.    Can a search be done for all custodians at once or is each custodian searched separately?**

Submitted searches are completed as they come in. That is if a search has one or more custodians all are searched at the same time with the same search terms and date range.

**2.    What size is the mailbox limit?**

HHS email accounts have a 100GB size limit. By default, that includes all emails and attachments for the last two years. When the email account approaches or exceeds the size limit, that can cause the mailbox to receive notification emails to that effect or might cause some issues using the mailbox. Anything older than two years is automatically moved to the Online Archive. The Online Archive size limit 1.5TB.

**3.    Outlook has the capability of generating a search report or log about the potentially responsive emails which would include, among other things, details about the number of hits and attachments. Can OCIO provide that search report or log?**

Every eDiscovery search result includes A "CSV summary page" a comma-separated value (CSV) file that provides a summary of data from a search conducted within the Microsoft Purview eDiscovery platform, typically including details like the total number of items found, locations where the data was discovered, and other relevant statistics, allowing users to easily analyze and export the search results for further processing in spreadsheet applications like Excel.

**4.    What is the maximum attachment size allowed?**

email attachments are limited to 35MB.

Ex. C. Emails.

In response to this, Reuters asked the Department, "Has OCIO generated a CSV summary page for this request per number 3? If so, are you able to share it?" Ex. D, Emails. The Department responded by sending Reuters an Excel spreadsheet containing the information requested. *See id.*

Reuters then asked the Department "to provide a CSV summary page for the remaining custodians." Ex. E, Email. "Since HHS is unable to deduplicate across custodians, we think we might be able to do that for [the Department] if we have each of the custodians' CSV summary pages." *Id.* In response, the Department sent Reuters an Excel spreadsheet. Ex. F, Email. Reuters expressed surprise that the spreadsheet did not look like the prior spreadsheet, and the Department

responded that "it is unrealistic to expect [the Department] to review search results that yielded a trillion files," and that Reuters "will need to provide clarification." Ex. G, Emails.

Reuters did not provide clarification, ask the Department any additional questions, request any additional information, or express any specific basis for being dissatisfied with the new Excel spreadsheet. Nor did Reuters narrow its request in any way whatsoever. Instead, nearly a month after the Department provided Reuters the second Excel spreadsheet, Reuters announced that it did "not think there is any benefit in further conferring between the parties." Ex. H, Email. Reuters opined that the information that the Department had provided over the preceding ten months was insufficient to enable it to "make informed narrowing decisions," and stated that it simply does "not believe the billions of hits number that [the Department] claims." *Id.* Reuters opined that the Department is obliged "to procure modern technology that can process these results" and expressed its position that the only way that the Department can meet its obligations under FOIA is to procure a software platform called RelativityOne, which, according to it, "many agencies across the federal government use," and which ostensibly "has the tools that a reasonable agency in 2025 would use to process FOIA requests." *Id.* Reuters identified the Departments of Homeland Security and Commerce as two agencies that use RelativityOne, but did not identify any other agencies beyond these two. Reuters likewise did not explain what "tools" RelativityOne has that would enable the Department to provide Reuters the information that Reuters requested. *Id.* Finally, Reuters also announced that it would move for an order setting a production rate of 1,500 pages per month. *Id.*

Although Reuters expressed a general dissatisfaction with the Department's second Excel spreadsheet, it did not identify any specific problem with the spreadsheet until three days later, on the date that the parties' Joint Status Report was due. *See* Jt. Status Rpt. at 7, ECF No. 52. Even then, Reuters did not set out its grievance with the second Excel spreadsheet in an email or phone

call. Instead, it set them out in edits to its portion of the status report, meaning that the Department only learned for the first time of the specific basis of Reuters' dissatisfaction with the second Excel spreadsheet at 5:48 PM on the day that the status report was due, and then only by reading Reuters' edits to its portion of the status report. *Id.* Reuters hastily added this explanation to its portion of the status report, moreover, only after the Department had pointed out that Reuters had never articulated the grounds for its dissatisfaction with the second Excel spreadsheet. *Id.* And even then, Reuters did not make any attempt to substantively discuss the matter with the Department.

Reuters moved for an order setting a production rate of 5,000 pages per month—not a rate of 1,500 pages per month, as it previously said that it would seek. *See* Pl.'s Mot.; *compare* Ex. H, Email. And although Reuters never attempted to ask the Department why it was unable to provide a spreadsheet resembling the prior spreadsheet, the Department nonetheless proactively answered that question, explaining that "the Microsoft platform currently used for enterprise searches no longer offers the level of granularity that Reuters is requesting. Accordingly, [the Department] provided Reuters with the only type of report the system is capable of generating." Ex. I, Email.

## ARGUMENT

For almost exactly a year, the Department has answered every single question that Reuters has posed to it. The Department also produced to Reuters a declaration explaining its search for responsive records and the reasons why processing the complete request would be unreasonably burdensome. In response to Reuters' request, the Department provided a summary spreadsheet for one custodian. And when Reuters requested similar information for the remaining custodians, the Department provided the best information that it could. When Reuters expressed dissatisfaction with that spreadsheet, it made no attempt to confer with the Department to find a path forward, or even to ask why the Department had not produced the information that it wanted. Reuters instead

rushed off to this Court to demand a briefing schedule. Reuters only expressed the grounds for its dissatisfaction with the new Excel spreadsheet in its edits to a Joint Status Report on the day that the status report was due—and then only as a transparent effort to prevent the Department from pointing out to this Court, in its portion of the status report, that Reuters had never even expressed the basis of its dissatisfaction. Even so, the Department explained to Reuters that its software platform no longer had the capacity to provide the level of granularity that Reuters is seeking, and that the Department has provided the only kind of report its system is capable of generating.

Nearly one year ago, this Court made clear that the parties were to work together to narrow Reuters' request—the Department by providing Reuters information to help it make an informed decision about how to narrow its request, and Reuters by using that information to narrow its request. The Department has upheld its end of the bargain. For almost a full year, the Department has given Reuters virtually all the information it seeks, answering Reuters' questions (and follow-up questions), producing a declaration, and producing Excel spreadsheets. There is only one thing that Reuters has requested that the Department did not provide, and the Department explained why it could not provide that information—its software platform no longer has the capacity to do so.

Reuters, unfortunately, has not done the same. Despite all the information the Department has provided over the course of the last year, Reuters has refused to narrow its request in any way. To the contrary, Reuters demands that the Department process its FOIA request exactly as written, without any narrowing. That is contrary to Reuters' stated willingness to narrow its request. During the status conference one year ago, this Court expressed its expectation that Reuters would use the information that the Department provided to narrow its request. That has not happened. The Court also expressed the view that the Department could not go on answering Reuters' questions forever,

and that at some point, Reuters would need to make do with the information provided to it and narrow its request. Nearly a year later, that time has come, if it had not already come earlier.

Reuters' request for an order setting a 5,000 page per month production order is facially unreasonable. That is ten times the 500 page per month rate that is typical in FOIA litigation in this District. *See, e.g.*, *Daily Caller News Found. v. FBI*, 387 F. Supp. 3d 112, 121 (D.D.C. 2019) (describing agency's 500 page per month processing rate as the "usual processing rate"); *see also Nat'l Sec. Couns. v. Dep't of Just.*, 848 F.3d 467, 472 (D.C. Cir. 2017) (policy of processing 500 pages per month "serves to promote efficient responses to a larger number of requesters"). Indeed, judges in this District have, in recent years, not infrequently ordered processing at an even lower rate of 300 pages per month, and sometimes at an even lower rate than that. *See, e.g.*, Min. Order, *Tobias v. Nat'l Insts. Of Health*, Civ. A. No. 23-1267 (JEB) (D.D.C. Sep. 6, 2023) (300 pages per month); Min. Order, *Bloomberg L.P. v. FDA*, Civ. A. No. 23-0716 (TNM) (D.D.C. Aug. 23, 2023) (approving, over plaintiff's objection, processing rate of 300 pages per month); Min. Order, *Proj. for Priv. & Surveillance Accountability, Inc. v. Off. of the Dir. of Nat'l Intel.*, Civ. A. No. 21-1217 (TSC) (D.D.C. Apr. 19, 2022) (approving, over plaintiff's objection, agency's processing rate of 100 pages per month); Min. Order, *Jud. Watch, Inc. v. Dep't of Health & Hum. Servs.*, Civ. A. No. 22-3153 (JEB) (D.D.C. Jul. 21, 2023) (300 pages per month); Min. Order, *White Coat Waste Proj. v. Dep't of Health & Hum. Servs.*, Civ. A. No. 22-3426 (JEB) (D.D.C. Mar. 6, 2023) (same).

Reuters offers only two cherry-picked counterexamples of courts ordering processing at a rate of 500 pages per month. *See Clemente v. FBI*, 71 F. Supp. 3d 262, 269 (D.D.C. 2014); *Open Soc'y Just. Initiative v. CIA*, 399 F. Supp. 3d 161, 169-70 (S.D.N.Y. 2019). These cases are easily distinguishable, as in neither of them was the plaintiff's request unreasonably burdensome. FOIA requires an agency to process a request only if it "reasonably describes [the] record[s]" sought. 5

U.S.C. § 552(a)(3)(A). A request does not reasonably describe the records sought if it is "so broad as to impose an unreasonable burden upon the agency." *Am. Fed'n of Gov't Emps. v. Dep't of Com.*, 907 F.2d 203, 209 (D.C. Cir. 1990). A search is unreasonably burdensome when it "would require the agency to locate, review, redact, and arrange for inspection a vast quantity of material." *Id.* As such, a request "triggers the agency's obligation to search for and disclose all responsive records" only when it "reasonably describes the records sought." *Ctr. for the Study of Servs. v. Dep't of Health & Hum. Servs.*, 874 F.3d 287, 288 (D.C. Cir. 2017) (cleaned up). If "the request as drafted would require an agency to undertake an unreasonably burdensome search, the agency can decline to process the request." *Nat'l Sec. Couns. v. CIA*, 969 F.3d 406, 410 (D.C. Cir. 2020). The requests in the two cases that Reuters cites were not unreasonably burdensome, *see Clemente*, 71 F. Supp. 3d at 269; *Open Soc'y*, 399 F. Supp. 3d at 169-70, whereas Reuters' request is unreasonably burdensome. Indeed, a request can be unreasonably burdensome if it "would take approximately 3675 hours" to process. *Wolf v. CIA*, 569 F. Supp. 2d 1, 9 (D.D.C. 2008). Here, processing Reuters' request would take about 42.75 times that long using the most conservative estimate, and 74.8 times as long using a moderate estimate. *See* Williams Decl. ¶ 44. Because Reuters' request is unreasonably burdensome, both *Clemente* and *Open Society* are inapposite.

Even putting that difference aside, *Clemente* and *Open Society* still are distinguishable on obvious grounds. The requester in *Clemente*, 71 F. Supp. 3d at 268, was "terminally ill," and "the status of [her] health" loomed heavily in the Court's analysis of the appropriate processing rate. That concern plainly has no application here. And in *Open Society*, 399 F. Supp. 3d at 167, the court deemed the request to involve "a matter of exceptional public importance and obvious and unusual time-sensitivity." But an exceptionally high processing rate for matters of exceptional importance must apply only in truly exceptional circumstances, lest the exception swallow the rule

and agencies become overwhelmed with obligations greater than their capacity to meet. It is one thing to apply an exceptional processing rate sparingly; it is another thing to apply it in the mine-run of FOIA litigation. However one characterizes the public interest in Reuters' FOIA request, it is not particularly greater than that of many other FOIA requests being litigated in this District. It would not be practicable to apply a 5,000-page processing rate in all cases where the request is of a public interest comparable to Reuters' request, and Reuters is not entitled to special treatment. Notably, *Open Society* was decided outside this District, where FOIA cases are far more common than in other Districts and judges here are more familiar with FOIA's burdens on agencies. The *Open Society* court thus may not have fully appreciated the consequences that will ensue if courts regularly set 5,000 page per month processing rates in cases that they deem sufficiently important. *See* 5 U.S.C. § 552(a)(4)(B) (venue in any FOIA case is proper in this District no matter where either party resides or the request is filed); *Am. Ctr. for L. & Just. v. Dep't of Homeland Sec.*, 573 F. Supp. 3d 78, 79 (D.D.C. 2021) ("Court dockets in this district overflow with [FOIA] matters.").

Reuters' final arguments are unpersuasive. Reuters asserts that it simply does not believe that the search yielded as many hits as the Department says, but its groundless skepticism is entitled to no weight. "Agency affidavits are accorded a presumption of good faith" in the FOIA context, and Reuters provides no reason why that presumption does not apply here. *Cabezas v. FBI*, 109 F.4th 596, 602 (D.C. Cir. 2024); *accord Kowal v. Dep't of Just.*, 107 F.4th 1018, 1027 (D.C. Cir. 2024) (same). The Department explained that a search conducted using the parties' agreed-upon protocol yielded about 1,571,373 pages, and explained in detail the methodology it used to reach this estimate. *See* Williams Decl. ¶ 43. Reuters' bare, unsupported skepticism does not overcome the presumption of good faith due to the this reasonably detailed and non-conclusory declaration.

Reuters' argument that the Department is obligated to purchase RelativityOne to satisfy its FOIA obligations, meanwhile, fails for three reasons. *First*, the reasonableness of the burden that processing a FOIA request would impose on an agency depends on the capabilities that an agency actually has, not on the capabilities that a plaintiff may wish the agency had or the capabilities that one might deem reasonable. *See, e.g.*, *Nat'l Sec. Couns. v. CIA*, 898 F. Supp. 2d 233, 275 (D.D.C. 2012), *aff'd*, 969 F.3d 406 (D.C. Cir. 2020) ("FOIA permits agencies to consider the configuration of their records systems in deciding whether a FOIA request 'reasonably describes' the records sought"); *Assassination Archives & Rsch. Ctr., Inc. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989) ("agencies are not required to maintain their records or perform searches which are not compatible with their own document retrieval systems."); *Blakey v. Dep't of Just.*, 549 F. Supp. 362, 366-67 (D.D.C. 1982) (agencies need not process "requests are not compatible with their own information retrieval systems"). In other words, a court's "unreasonable burden" inquiry takes an agency as it comes—it does not require the agency to procure expensive new information technology.

*Second*, Reuters fails to show that principles of reasonableness compel the Department to procure RelativityOne. While Reuters claims that "many agencies across the federal government use" RelativityOne, it offers only two such examples, Ex. H, Emails, which hardly suggests that RelativityOne is so widely used that any agency must procure it in order to be reasonable. The fact that two agencies use RelativityOne does not mean that an agency must procure this software to be reasonable. Indeed, the fact that Reuters can identify only two agencies that use RelativityOne suggests the opposite—that RelativityOne is not so widely used that principles of reasonableness compel agencies to buy it. And although Reuters claims that RelativityOne "has the tools that a reasonable agency in 2025 would use to process FOIA requests," *id.*, it fails to specify what those

"tools" even are, let alone show that RelativityOne has them, that the Department's own software does not have them, or that the strictures of reasonableness require an agency to possess them.

*Third*, even taking its claims at face value, Reuters argues that the Department requires RelativityOne not to process Reuters' request, but to perform collateral analyses so that it can give Reuters the information that Reuters wants to narrow its request's scope. But that is far afield from the actual processing of FOIA requests—the question that is relevant to an unreasonable burden analysis—which the Department's existing technology is wholly sufficient to do (and Reuters does not argue otherwise). "The FOIA also does not require agencies to conduct research by answering questions." *Nat'l Sec. Couns.*, 898 F. Supp. 2d at 269 (cleaned up, citing *Hudgins v. IRS*, 620 F. Supp. 19, 21 (D.D.C.1985), *aff'd*, 808 F.2d 137 (D.C. Cir. 1987)). For a year, the Department has been answering Reuters' questions in a good faith attempt to work with Reuters to narrow the scope of its request. But there is no legal basis to say that when a requester submits an overly broad FOIA request, then the agency not only must answer the requester's questions to help the requester narrow its request but also is obliged to purchase expensive new information technology to do so. Such an assertion defies reason. FOIA does not impose a burden on agencies to purchase whatever software a requester thinks will help the agency give it information to narrow its request. To the contrary, FOIA imposes on the requester the burden to not submit a request so broad that it requires narrowing in the first place. *See Am. Ctr.*, 573 F. Supp. 3d at 88 ("FOIA envisions that applicants will reasonably describe the records they seek, and agencies are entitled to demand it.").

Granting Reuters a 5,000 page per month processing rate is especially unwarranted given Reuters' refusal to narrow its request in any way. The Department has answered every question that Reuters asked, provided every piece of information that it requested except one, and explained

why it could not provide that information. Under these circumstances, the Court should not reward Reuters' refusal to narrow its request with a processing rate that is ten times the usual rate.

Finally, Reuters' motion warrants denial for an additional reason, as well: Reuters failed to comply with Local Civil Rule 7(m)'s requirements that it meet and confer with opposing counsel and "include in its motion a statement that the required discussion occurred, and a statement as to whether the motion is opposed." *See, e.g., U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, Inc., 235 F.R.D. 521, 529 (D.D.C. 2006) ("The obligation to confer . . . requires a good faith effort to resolve the non-dispositive disputes that occur in the course of litigation.  As such, failure to comply with the conference requirement is sufficient basis to deny a motion to compel"); *Sokos v. Hilton Hotels Corp.*, 283 F.Supp.2d 42, 55 (D.D.C. 2003) (movant's failure to comply with the good faith conference requirement resulted in a denial of movant's motion to strike testimony and an award of attorney's fees to the non-moving party).

*      *      *

**CONCLUSION**

This Court should deny Reuters' motion for production order.

Dated: September 1, 2025        Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: /s/ _____

    BRADLEY G. SILVERMAN
    D.C. Bar #1531664
    Assistant United States Attorney
    601 D Street NW
    Washington, DC 20530
    (202) 252-2575
    bradley.silverman@usdoj.gov

    *Attorneys for the United States of America*